IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| BARBARA BUSBEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 12-3276-CV-S-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Barbara Busbey seeks review of the final decision of the Commissioner

of Social Security denying plaintiff's application for disability benefits under Title XVI of

the Social Security Act ("the Act").  Plaintiff argues that the ALJ erred (1) in relying on

the vocational expert testimony because it conflicted with the Dictionary of Occupational

Titles, (2) in failing to describe the evidence supporting plaintiff's residual functional

capacity, and (3) in improperly dismissing the opinion of David McVicker, a nurse

practitioner, who completed a Medical Source Statement Physical.  I find that the

substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is

not disabled.  Therefore, plaintiff's motion for summary judgment will be denied and the

decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On July 28, 2009, plaintiff applied for disability benefits alleging that she had

been disabled since September 24, 2008.  Plaintiff's disability stems from fibromyalgia,

depression and anxiety.  Plaintiff's application was denied on October 8, 2009.  On

November 3, 2010, a hearing was held before an Administrative Law Judge.  On

November 12, 2010, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On April 2, 2012, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.   STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of

choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.   BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

              Yes = not disabled.
              No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>       No = not disabled.
>       Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

>       Yes = disabled.
>       No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

>       No = not disabled.
>       Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

>       Yes = disabled.
>       No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert James Adams, in addition to documentary evidence admitted at the hearing.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Earnings Record

The record shows that plaintiff earned the following income from 1987 through 2010:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1987 | $ 107.20 | 1999 | $ 0.00 |
| 1988 | 2,908.94 | 2000 | 383.86 |
| 1989 | 2,177.12 | 2001 | 490.41 |

| | | | |
|---|---|---|---|
| 1990 | 0.00 | 2002 | 0.00 |
| 1991 | 675.00 | 2003 | 0.00 |
| 1992 | 3,170.71 | 2004 | 1,310.40 |
| 1993 | 2,643.97 | 2005 | 9,837.87 |
| 1994 | 1,283.50 | 2006 | 6,931.68 |
| 1995 | 5,314.95 | 2007 | 52.18 |
| 1996 | 5,051.19 | 2008 | 0.00 |
| 1997 | 3,605.73 | 2009 | 0.00 |
| 1998 | 5,819.81 | 2010 | 0.00 |

(Tr. at 107).

**Disability Report Field Office**

On July 28, 2009, interviewer P. Smith met face to face with plaintiff and observed that she had no difficulty with understanding, coherency, concentrating, answering, sitting, standing, walking, using her hands, or writing (Tr. at 132). Plaintiff's appearance and dress were normal.

**Function Report**

Plaintiff reported that she drives her mother to a dialysis clinic; she takes care of two dogs; she prepares complete meals, pizza, sandwiches, and snacks; she cleans, does laundry and mows the yard; she goes outside daily and is able to go out alone; she drives; she shops in stores for food and household items; she is able to pay bills, count change, and use a checkbook; she reads for enjoyment; and she is able to go to the doctor alone (Tr. at 134-141). Her impairments do not affect her ability to stand, sit, complete tasks, follow instructions or use her hands (Tr. at 139). She can only pay attention for "minutes". She gets along okay with authority figures (Tr. at 140).

5

**B.     SUMMARY OF TESTIMONY**

During the November 3, 2010, hearing, plaintiff testified; and James Adams, a vocational expert, testified at the request of the ALJ.

**1.     Plaintiff's testimony.**

At the time of the hearing plaintiff was 42 years of age (Tr. at 28).  Plaintiff is married and has an 8-year-old daughter (Tr. at 29).

Plaintiff has a driver's license and she does drive (Tr. at 29).  She does housework (Tr. at 30).  She sometimes has to have help getting back up if she gets down on the floor, and she needs help lifting heavy things (Tr. at 30).  Plaintiff does laundry, cooks, mows the yard, goes shopping, eats out sometimes, and goes to teacher conferences with her daughter (Tr. at 30-31).  Plaintiff helped take care of her mother and grandmother (Tr. at 31).  She helps bathe and dress her mother (Tr. at 31).  Plaintiff takes her mother to the doctor (Tr. at 32).

Plaintiff was diagnosed with bipolar disorder (Tr. at 32).  Her medication causes her to be sleepy (Tr. at 33).  Plaintiff's medications help but she still has breakthrough pain and anxiety (Tr. at 34).  Plaintiff has panic attacks that, when mild, last a half hour but when they are severe she has to go to the hospital in an ambulance (Tr. at 34).  She has about three or four mild panic attacks per month (Tr. at 34-35).

Plaintiff's bipolar disorder causes mostly depression (Tr. at 35).  She does not want to do anything, talk to anyone, see anyone (Tr. at 35). She has crying spells and gets very angry (Tr. at 35).   When plaintiff was working, other workers would get on her nerves and she would yell at them and get into arguments (Tr. at 36).  After about a

year on the job, plaintiff used up all of her sick days and Family Medical Leave Act days (Tr. at 36-37).

Plaintiff's fibromyalgia causes pain in her entire body (Tr. at 37). Lifting or standing for very long exacerbates her pain, and cold weather does the same (Tr. at 37). Plaintiff can sit for about a half an hour (Tr. at 37). Plaintiff is able to stand long enough to do dishes without taking breaks, i.e., about 10 minutes (Tr. at 37-38). Plaintiff can lift about 15 to 20 pounds (Tr. at 38). She could not lift that much several times a day (Tr. at 38). Her pain never goes away, but her medication and lying down ease her pain (Tr. at 39). If plaintiff is at home, she is lying her couch all day long (Tr. at 39).

**2.    Vocational expert testimony.**

Vocational expert James Adams testified at the request of the Administrative Law Judge. Mr. Adams was directed to point out any inconsistencies between his testimony and the Dictionary of Occupational Titles and associated publications (Tr. at 40).

Plaintiff previously worked as a cashier at Dollar General and at Mini Mart convenience store, a stocker/cashier at Big Lots, a presser at a dry cleaner, and a sewing machine operator at a shoe factory (Tr. at 41-42).

The first hypothetical involved a person who could lift or carry 20 pounds occasionally and 10 pounds frequently; walk or stand six hours per workday; sit for six hours per workday; would not be able to do work that demands attention to details or complicated instructions or job tasks; she could not work in close cooperation or

interaction with coworkers; the job could require no cooperation or interaction with the general public; she could maintain attention and concentration for two hours at a time, adapt to changes in the workplace on a basic level, and accept supervision on a basic level (Tr. at 43). The vocational expert testified that such a person could work as a cleaner, DOT 323.687-014, which is light work where people go in and clean buildings or houses (Tr. at 43). There are 887,890 such jobs in the country and 21,600 in Missouri (Tr. at 43). The person could work in some assembly jobs, DOT 706.684-022, with the ability to sit or stand, would have minimal instructions and minimal contact with others (Tr. at 43). There are 239,500 such jobs in the country and 5,700 in Missouri (Tr. at 43). The person could not perform sedentary jobs due to the limitation on public and coworker contact (Tr. at 44).

## C.   SUMMARY OF MEDICAL EVIDENCE

On June 25, 2008, the day after plaintiff's alleged onset date, she was seen at Heart Care Services complaining of chest pains (Tr. at 223-225). She was described as a pleasant, youthful appearing 40-year-old female. She appeared "a little bit anxious but in no acute distress." Qudir Hammad, M.D., was unable to find anything wrong with plaintiff after extensive testing. He noted compliance issues and assessed "economic status/anxiety."

On July 10, 2008, plaintiff returned to Heart Care Services (Tr. at 226-228). She was noted to be "under a lot of stress caring for her parents." She was observed to be pleasant and a little bit anxious but in no acute distress. Plaintiff had a history of cigarette smoking. Cardiac testing was recommended and she was told to take a baby

8

aspirin each day. Four days later she had a cardiac catheterization which was normal (Tr. at 229-230).

On July 23, 2008, plaintiff was seen at Ozarks Medical Center complaining of leg and foot tenderness which she rated an 8 or 9 out of 10 in intensity (Tr. at 321-327). She continued to smoke. On exam her back was normal, blood work was normal, her psychiatric exam was normal, and no communication issues were observed. An ultrasound of her right leg showed no evidence of deep venous thrombosis (Tr. at 446). On the nurse assessment she was observed to be walking with an antalgic gait. There was no abnormal finding and no assessment. She was prescribed a narcotic pain reliever and a non-steroidal anti-inflammatory.

On July 28, 2008, plaintiff returned to Heart Care Services (Tr. at 231-233). Despite her testimony that her mild panic attacks last a half an hour, the panic attacks she described to this cardiologist were 3 to 4 minutes in duration. She was observed to be pleasant and a little bit anxious-appearing but in no acute distress. Despite significant testing, everything was determined to be normal. Plaintiff had complained of leg pain, and Dr. Hammad assessed (among other unrelated things) "bilateral leg discomfort related to neurological impingement (?) from the patient lying on the cath table aggravating underlying neurological lower extremity impingement (?)." She was told to have films of her lumbosacral spine which were done the following day and were normal (Tr. at 447, 467).

On August 14, 2008, plaintiff returned to Heart Care Services (Tr. at 234-236). Dr. Hammad noted that plaintiff had not followed his advice from her last appointment

9

to increase a particular cardiac medication, and she continued to smoke "and cannot be dissuaded."  Her lumbosacral spine "was normal."  She was observed to be pleasant and only a little bit anxious.

On October 10, 2008, plaintiff was seen at Ozarks Medical Center (Tr. at 504).  She reported having a lot of family problems right now and had not started her Lyrica yet as previously directed.

On October 27, 2008, plaintiff was seen at Ozarks Medical Center complaining of crying and the partially illegible records refer to plaintiff's grandmother (Tr. at 334).  On exam she was noted to be anxious, but her physical exam was entirely normal as was her psychiatric exam.  She had normal non-tender extremities with full range of motion, her back was normal, she was oriented times three with normal mood and affect.  She was assessed with depression/stress and "caregiver role strain" (Tr. at 338).  "Pt. tearful, expresses feelings of being overwhelmed at caregiver role for mother & grandmother" (Tr. at 339).

On November 14, 2008, plaintiff was seen at Ozarks Medical Center complaining of constipation (Tr. at 347-359).  On exam her back was normal, her extremities were non-tender with normal range of motion, her psychiatric exam was entirely normal.  She was assessed with constipation.

On December 16, 2008, plaintiff was seen at Ozarks Medical Center complaining of chest pain (Tr. at 366-377).  Her musculoskeletal exam was normal; her psychiatric exam was normal.  No communication deficit was noted.  She had films of her abdomen done due to complaints of abdominal pain, and those were normal.  She had

10

films of her heart which were normal.

On December 18, 2008, plaintiff returned to see Dr. Hammad (Tr. at 237-239). He noted that plaintiff's grandmother had died in October 2008 which had caused a great deal of stress. Plaintiff indicated she was being treated for "intermittent bouts of depression." She was observed to be pleasant and only a little bit anxious.

On March 23, 2009, plaintiff was seen at Ozarks Medical Center (Tr. at 379-397). She complained of a headache and chest pain. Plaintiff continued to smoke one and a half packs of cigarettes per day. She reported a history of anxiety and depression, but on this date her psychological exam was entirely normal. Exam of her extremities revealed that they were non-tender with normal range of motion. Her blood work and cardiac tests were normal. She was told to keep well hydrated, and avoid caffeine and nicotine.

On March 27, 2009, plaintiff went to Ozarks Medical Center complaining of a headache (Tr. at 400-403). She rated her headache pain a 7 or 8 out of 10. She reported a history of constipation, GERD, depression and anxiety. Plaintiff left without being seen by a doctor (Tr. at 403).

On June 3, 2009, plaintiff went to Ozarks Medical Center by ambulance reporting that she had stepped off a curb, "jammed her entire body," and apparently injured her back (Tr. at 405-418). On exam her extremities were all normal, her psychiatric exam was normal, CT scan of her cervical spine was normal except "slight degenerative disc changes," x-rays of her lumbar spine were unchanged since July 29, 2008, x-rays of her thoracic spine were normal. She was assessed with back strain and was given non-

11

steroidal anti-inflammatories and a muscle relaxer.

On June 19, 2009, plaintiff saw Diedra Hayman, Ph.D., at Behavioral Health Care (Tr. at 240-242). Plaintiff reported that she was stressed out, felt like she was the only one people went to for help, she was anxious and depressed and wanted to be left alone. She was smoking up to 2 packs of cigarettes per day. She reported having had these problems for years. She reported that she is able to care for herself, she "takes care of her mother and father, and her daughter, as well as her husband." She reported that she enjoyed reading. Dr. Hayman observed that plaintiff was casually dressed, adequately groomed, cooperative, calm, had normal speech, normal behavior, coherent and logical thought processes, was oriented times four, had good judgment and insight, good recent and long term memory, good attention, good concentration, and average intellect. The only abnormal observation was that plaintiff had an anxious and depressed mood. Dr. Hayman recommended individual therapy.

On June 24, 2009, plaintiff was seen at Ozarks Medical Health (Tr. at 420-430). She complained of anxiety for the past three days. Her back, neck, and extremities were all normal on exam, and her psychological exam was entirely normal. She was assessed with anxiety and was given Hydroxyzine.

On July 24, 2009, plaintiff was seen in the emergency room with an anxiety attack (Tr. at 431-441). Her psychological evaluation was entirely normal. She was assessed with Effexor Withdrawal Syndrome.

On July 28, 2009, plaintiff applied for disability benefits. That same day, she went to Ozarks Medical Center for a follow up and reported that she had stopped taking

12

her Effexor, an antidepressant (Tr. at 449). She complained of fibromyalgia. Her exam was normal. She was assessed with anxiety, depression and fibromyalgia.

On August 4, 2009, plaintiff was seen at Ozarks Medical Center (Tr. at 448). Her physical exam was normal. She was assessed with fibromyalgia and was prescribed a muscle relaxer.

On October 8, 2009, Kenneth Bowles, Ph.D., completed a Psychiatric Review Technique finding that plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation (Tr. at 478). In a Residual Functional Capacity Assessment, he found that plaintiff was moderately limited in the ability to understand, remember and carry out detailed instructions and to interact appropriately with the general public. In all other areas, Dr. Bowles found no significant limitation. That same day, plaintiff's application for disability benefits was denied initially.

On November 10, 2009, plaintiff saw Marti Warden, a nurse practitioner, who observed that plaintiff was alert and talkative, and her psychiatric exam was normal except a flat affect (Tr. at 540-541).

On January 8, 2010, plaintiff was seen at the Ozarks Medical Center emergency room after having been in a car accident (Tr. at 566-567). She had not been wearing her seat belt. She had tenderness in her neck and abdomen. Her psychiatric exam was entirely normal. She had CT scans and x-rays which were normal except she had joint effusion likely in a knee (water on the knee) (Tr. at 572).

Case 6:12-cv-03276-REL   Document 17   Filed 09/28/13   Page 13 of 28

On March 9, 2010, plaintiff saw Marti Warden, a nurse practitioner, for a rash (Tr. at 521). She reported "feeling well".

On March 15, 2010, plaintiff called the office of Aaron Mills, M.D., and stated that she had been taking 3 anxiety pills a day instead of 2 as directed and she was down to one pill (Tr. at 520). She wanted a new prescription called in to her pharmacy.

On April 2, 2010, plaintiff saw Marti Warden, a nurse practitioner (Tr. at 514-514). Plaintiff was observed to be cooperative and well groomed. She continued to smoke one and a half packs of cigarettes per day.

On April 15, 2010, plaintiff saw Dr. Mills for a recheck on anxiety (Tr. at 512-513). Dr. Mills observed that plaintiff's gait was normal, she was oriented times three. Plaintiff indicated she had been going through her Clonazepam (anxiety medication) "too fast." Dr. Mills gave plaintiff a prescription for Clonazepam and told her it had to last her 30 days.

On June 18, 2010, plaintiff saw Leslie Bilhovde, M.D., and reported having taken more of her medication than was prescribed, and then she ran out before it was time for a refill and "almost went crazy." (Tr. at 510-511). Plaintiff continued to smoke a pack and a half of cigarettes per day. She said she did not remember who diagnosed her with fibromyalgia. Dr. Bilhovde recommended Lyrica, but plaintiff said she took that in the past and gained ten pounds in one month and so she was not willing to try it again. "I usually do not give chronic benzos or chronic narcotics, especially not together. . . . As for her fibromyalgia if she is not willing to try Lyrica again then I have no new recommendations."

14

On June 30, 2010, plaintiff saw Robb Imonen, D.O., a psychiatrist (Tr. at 545). She complained about problems she was having with her family. "She says she is not having a lot of pain and she is stable". Dr. Imonen prescribed Abilify (antidepressant).

On July 14, 2010, plaintiff saw Robb Imonen, D.O. (Tr. at 543). She was using hydrocodone (narcotic) every day and reported that the Abilify had helped clear her thinking. She complained that Dr. Mills told her that "nobody needed 1 mg of Klonopin three times a day" so he had her on that dose twice a day. Dr. Imonen prescribed Flexeril (muscle relaxer), hydrocodone (narcotic), Cymbalta (antidepressant), cyclobenzaprine (muscle relaxer), clonazepam (for anxiety), Abilify (antidepressant), and Pristiq (treats depression).

On July 21, 2010, plaintiff saw Michael Moore, M.D., to establish care (Tr. at 595-598). Plaintiff was smoking one and a half packs of cigarettes per day and consuming more than five caffeinated beverages per day. Dr. Moore performed an examination and then recommended that plaintiff get regular exercise.

On August 9, 2010, plaintiff was seen at the Ozarks Medical Center emergency room due to back pain (Tr. at 562-564). Her psychiatric examination was entirely normal. Her extremities were non tender with full range of motion. She had a muscle spasm in her back. She was assessed with acute back pain.

On October 8, 2010, Dr. Imonen prepared a Medical Source Statement Mental, (Tr. at 588-589). He found that plaintiff was markedly limited in her ability to remember locations and work like procedures; understand and remember very short and simple instructions; understand and remember detailed instructions; maintain attention and

concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation.  He found that plaintiff was extremely limited in her ability to carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. He found that plaintiff was moderately limited in her ability to carry out very short and simple instructions; ask simple questions or request assistance; accept instructions; and respond appropriately to criticism from supervisors.

On October 16, 2010, Joseph Gaeta, M.D., completed interrogatories at the request of the ALJ (Tr. at 603-609). Dr. Gaeta found that the medical evidence does not support plaintiff's allegations of depression, anxiety, fibromyalgia, heart problems, panic attacks, high cholesterol, and hiatal hernia (Tr. at 605).  Dr. Gaeta indicated that cardiac disease was not established. "Fibromyalgia may be present but not established in my

16

view and would not be limiting if it were." He stated that plaintiff may have anxiety, depression and panic issues but those were beyond his area of expertise.

November 3, 2010, was plaintiff's administrative hearing.

## V.   FINDINGS OF THE ALJ

Administrative Law Judge Michael Shilling entered his opinion on November 12, 2010 (Tr. at 12-22).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 14).

Step two.  Plaintiff has the following severe impairments:  fibromyalgia, affective mood disorder, and anxiety related disorder (Tr. at 14).  Plaintiff's alleged Vasospastic or microvascular angina or cardiac disease are not medically determinable impairments (Tr. at 14).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14-16).

Step four.  Plaintiff retains the residual functional capacity to perform light work (Tr. at 16). She is able to lift and carry 20 pounds occasionally and 10 pounds frequently; she can stand or walk for 6 hours per day; she can sit for 6 hours per day; she is limited to jobs that do not demand attention to details or complicated instructions of job tasks, that do not require close cooperation and interaction with co-workers, and that do no require cooperation and interaction with the general public.  She can maintain concentration for two-hour periods at a time, she can adapt to changes in the

17

workplace at a basic level, and she can accept supervision on a basic level (Tr. at 16). Plaintiff has no past relevant work (Tr. at 20).

Step five. Plaintiff can work in cleaning jobs or assembly jobs, which are available in significant numbers in the state and national economy (Tr. at 21)

## VI.  OPINION OF NURSE PRACTITIONER

Plaintiff argues that the ALJ erred in dismissing the opinion of nurse practitioner David McVicker who completed a Medical Source Statement Physical on September 21, 2010, finding that plaintiff could lift less than 5 pounds, stand or walk no more than 2 hours per day and less than 15 minutes at a time, sit for no more than 1 hour per day and for 30 minutes at a time, would need to lie down during the work day, and had decreased concentration due to side effects of hydrocodone.

The Social Security Administration issued Social Security Ruling (SSR) 06-3p, 71 Fed. Reg. 45,593 (Aug. 9, 2006) which clarified how it considers opinions from sources who are not what the agency terms "acceptable medical sources."  SSA separates information sources into two main groups: "acceptable medical sources" and "other sources."  It then divides "other sources" into two groups:  medical sources and non-medical sources. 20 C.F.R. §§ 404.1502, 416.902 (2007).

Acceptable medical sources include licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists.  20 C.F.R. § § 404.1513(a), 416.913(a) (2007).  According to Social Security regulations, there are three major distinctions between acceptable medical sources and the others:

18

1.   Only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment.  Id.

2.   Only acceptable medical sources can provide medical opinions.  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (2007).

3.   Only acceptable medical sources can be considered treating sources.  20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007).

In the category of "other sources," again, divided into two subgroups, "medical sources" include nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists. "Non-medical sources" include school teachers and counselors, public and private social welfare agency personnel, rehabilitation counselors, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. §§ 404.1513(d), 416.913(d) (2007).

"Information from these 'other sources' cannot establish the existence of a medically determinable impairment," according to SSR 06-3p.  Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007).   "Instead, there must be evidence from an 'acceptable medical source' for this purpose.  However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  Id. quoting SSR 06-3p.

The ALJ had this to say about the opinion of Mr. McVicker:

David McVicker, a family nurse practitioner, submitted a statement in relation to the claimant's physical capabilities.  Mr. McVicker opined that during an eight-hour day the claimant can lift and or carry less than five pounds total; stand and/or walk less than 15 minutes at a time; stand/walk a total oftwo hours; sit

19

continuously for only 30 minutes for a total of one hour, and be limited in her push/pull activities. He also opined that the claimant should never be required to balance, be exposed to vibrations, hazards, or heights. The undersigned gives these opinions in relation to extreme limitations for this claimant little weight. Mr. McVicker is not an acceptable medical source pursuant to SSR 06-03p, as he is a nurse practitioner. Additionally, his limitations are not supported or consistent with the medical record as a whole, or the testimony of the claimant at hearing as to her abilities. Based on the medical record, it would appear Mr. McVicker apparently relied quite heavily on the subjective reports of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints.

(Tr. at 18).

Mr. McVicker's RFC assessment does not qualify as a medical opinion as he is not an acceptable medical source. His opinion can only provide "insight into the severity of the impairment(s) and how it affects the individual's ability to function."

There are very few records from Mr. McVicker in this file:

On April 21, 2010, plaintiff saw Mr. McVicker with a chief complaint of depression (Tr. at 55-555). Her general appearance was normal, her psychiatric exam was entirely normal. He did not examine her musculoskeletal system, and she made no musculoskeletal complaints. He assessed general anxiety disorder and fibromyalgia; however, there were no abnormal findings on his exams to substantiate these assessments.

On June 3, 2010, plaintiff saw Mr. McVicker with a chief complaint of depression (Tr. at 552-553). He did not perform any physical exam, as that entire portion of the form is blank. There are no physical complaints noted. Plaintiff's psychiatric exam was entirely normal, including her mood. Despite that, Mr. McVicker assessed depression.

20

On September 20, 2010, plaintiff saw Mr. McVicker and provided him with paperwork for disability (Tr. at 550). The chief complaint is listed as "disability." Under musculoskeletal on the form, Mr. McVicker wrote only, "as above." There is no medical information on this form.

The following day, on September 21, 2010, Mr. McVicker performed an exam and noted a normal general appearance (which includes grooming) and a normal cardiovascular exam. On musculoskeletal, he circled "tenderness" and wrote "all fibromyalgia points + pain". He left blank the assessment regarding her gait and station and all of her extremities. Her psychiatric exam was completely normal, despite her last appointment having been due to depression. Everything about this examination is subjective.

That same day, he used a form with all 18 fibromyalgia tender points noted on a drawing of a body (Tr. at 547). He circled all 18 of them. There are no other notes on this form. I note that many of the fibromyalgia tender points are on the arms and legs, and plaintiff's medical records consistently show that she had no tenderness in any of her extremities at any time when examined by all of the medical professionals who provided records in this case.

Mr. McVicker then used a check-mark and circle-the-answer form to complete a medical statement in connection with plaintiff's disability claim (Tr. at 548). He checked every single symptom on the form: history of widespread pain for three months or more, pain in 11 or more pressure points, stiffness, irritable bowel syndrome, tension

headaches, parenthesis,[1] sensation of swollen hands, sleep disturbance, chronic fatigue, memory loss, and inability to ambulate effectively, e.g. inability to walk a block at a reasonable pace on rough or uneven surface, inability to walk enough to shop or bank, or inability to climb a few steps at a reasonable pace with the use of a single handrail.

He indicated that plaintiff can work no hours per day, stand for 15 minutes at a time, stand for "no" time during the day, sit for 60 minutes at a time and for 60 minutes total per day, lift 5 pounds occasionally and no weight frequently, bend occasionally, stoop occasionally, and raise her arms over shoulder level occasionally.

There are no allegations of, observations of, tests for, or diagnoses related to widespread pain, stiffness, irritable bowel syndrome, paresthesia, swollen hands, sleep disturbance, fatigue, memory loss, or an inability to ambulate (other than on one occasion when plaintiff hurt her knee in a car accident, but that was on one occasion only). Mr. McVicker is apparently not associated with any doctor, as his records are entitled "McVicker Family Healthcare". Clearly his treatment records do not even begin to support his extreme assessment in the medical source statement he completed.

Additionally, the opinion contradicts plaintiff's own testimony during the hearing and in her administrative paperwork. For example, he found that plaintiff could stand for "no" time during the day, yet she reported that her impairments do not affect her ability to stand. The ALJ properly gave this opinion no weight.

---

[1]I assume this is supposed to be paresthesia, because I have been able to find no medical definition for "parenthesis."

## VII.   VOCATIONAL EXPERT TESTIMONY

Plaintiff argues that the ALJ erroneously relied on the vocational expert's testimony that plaintiff could work as a cleaner or do assembly work because the residual functional capacity included the limitation that plaintiff have no interaction with the public.  "According to the Dictionary of Occupational Titles, a cleaner 'renders personal assistance to patrons.'  The residual functional capacity also provided that plaintiff not have close cooperation and interaction with coworkers as she works better in relative isolation.  Yet, the Dictionary of Occupational Titles provides that an assembler 'frequently works at bench as member of assembly group assembling one or two specific parts and passing unit to another worker' and therefore requires continuous cooperation and interaction with co-workers to accomplish the common workplace tasks."

Plaintiff's argument is without merit.  If one could rely solely on the Dictionary of Occupational Titles, the testimony of a vocational expert would not be necessary.   A claimant's reliance on the DOT as a definitive authority on job requirements is misplaced because DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range.  Moore v. Astrue, 623 F.3d 599, 604 (8th Cir. 2010), citing Page v. Astrue, 484 F.3d at 1040, 1045 (8th Cir. 2007).  "The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities."  Moore v. Astrue, 623 F.3d at 604, quoting Wheeler v. Apfel, 224

23

F.3d 891, 897 (8th Cir. 2000).  "In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT."  Id.

There is nothing in the record to suggest that the vocational expert ignored the interaction limitations in the hypothetical in determining that the listed occupations encompassed suitable jobs.  Moore v. Astrue, 623 F.3d at 604, citing Whitehouse v. Sullivan, 949 F.2d 1005, 1006 (8th Cir. 1991) ( "[T]he ALJ could properly assume that the expert framed his answers based on the factors the ALJ told him to take into account.").  Because substantial evidence supports the ALJ's phrasing of the hypothetical to the vocational expert, and there was no conflict between the vocational expert's testimony and the DOT, the ALJ properly relied on the vocational expert testimony.   Page v. Astrue, 484 F.3d at 1045 ("A vocational expert's testimony based on a properly phrased hypothetical question constitutes substantial evidence.").

## VIII.    EVIDENCE SUPPORTING RFC

Plaintiff argues that the ALJ erred in formulating an RFC without citing any medical evidence for the various limitations imposed.  "The ALJ must provide a logical bridge between the medical evidence and the result."  Plaintiff challenges the ALJ's failure to elicit a medical opinion "thereby requiring reversal. . . .  [T]he ALJ gave significant weight to the opinion of medical expert, Joseph Gaeta, MD. . . to formulate Plaintiff's RFC [but] . . . Dr. Gaeta believed there was no evidence to support the diagnosis of fibromyalgia, and stated that this impairment would not cause any limitations" however the ALJ found that plaintiff's fibromyalgia was a severe impairment.

24

Plaintiff argues that the ALJ's opinion is erroneous because he failed to describe the medical evidence supporting plaintiff's physical RFC. "SSR 96-8p requires the ALJ to specify what medical evidence he relied on in forming the RFC and how that evidence supported the limitations included in the RFC The ALJ must provide a logical bridge between the medical evidence and the result. Failure to provide such a link requires that the case be remanded back to the ALJ." (see plaintiff's brief at p. 19). In support, plaintiff cites Daniel v. Massanari, 167 F. Supp. 2d 1090 (D. Neb. 2001), and Kelly v. Callahan, 133 F.3d 583 (8th Cir. 1988). Plaintiff's argument is without merit.

Daniel v. Massanari did not discuss any bridge or nexus requirement, and SSR 96-8p (quote above) does not explicitly require any such thing. In Kelly v. Callahan, the court of appeals criticized the ALJ for failing to address the opinion of a treating physician which not only corroborated the claimant's allegations but was consistent with the other evidence in the record (of which there apparently was not much, with the exception of the ignored doctor's records). In that case the ALJ also stated that a doctor is not permitted to provide an opinion as to the number of hours a claimant can work each day, and the court of appeals pointed out that such opinions are not only permitted but encouraged. Neither of those cases support plaintiff's argument that a particular bridge or nexus is required before an ALJ has escaped a mandatory remand.

I have been unable to find any Supreme Court case, Eighth Circuit Case, or Western District of Missouri case that requires such a bridge or nexus when an ALJ assesses a claimant's residual functional capacity. Although Judge Posner, from the Seventh Circuit Court of Appeals, has been quoted by some courts in other jurisdictions

Case 6:12-cv-03276-REL   Document 17   Filed 09/28/13   Page 25 of 28

with respect to such a nexus, this court is not bound by those opinions but is required to follow the case law of the Western District of Missouri, the Eighth Circuit Court of Appeals, and the Supreme Court of the United States.

The ALJ is not required to provide each limitation in the residual functional capacity assessment immediately followed by a list of the specific evidence supporting this limitation. See SSR 96-8p. Such would not only be anathema to a finding based on "all of the relevant evidence," but would result in overly lengthy decisions containing duplicative discussions of the same evidence in multiple sections. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). Such a requirement for duplicative and exacting discussion of every piece of evidence would only add further delay to the current backlog of cases awaiting decision by an ALJ, a backlog growing by the day. As the Supreme Court has stated, "[t]he disability programs administered under Titles II and XVI are of a size and extent difficult to comprehend," Heckler v. Day, 467 U.S. 104, 106 (1984), and "[t]he need for efficiency is self-evident." Barnhart v. Thomas, 540 U.S. 20, 28-29 (2003) (internal quotations omitted).

The ALJ found that plaintiff can lift 20 pounds occasionally and 10 pounds frequently. Plaintiff testified that she could lift 15 to 20 pounds and only upon further questioning did she limit that to only once per day. Plaintiff has pointed to no medical records suggesting that she is limited in her ability to lift, except the records of Nurse Practitioner McVicker which was discussed above and is entitled to no weight.

The ALJ found that plaintiff could stand or walk for six hours per day or sit for six hours per day. An interviewer who met face to face with plaintiff observed that she had

no difficulty sitting, standing, or walking. In a Function Report plaintiff herself said that her impairments do not affect her ability to stand or sit. None of plaintiff's treatment providers observed that plaintiff had any difficulty with sitting, standing or walking.

The ALJ's findings with respect to plaintiff's inability to do work demanding an attention to detail, complicated instructions, close cooperation and interaction with coworkers, cooperation and interaction with the general public, maintain attention and concentration for more than two hours at a time, adapt to changes in the workplace at a level beyond "basic", and accept supervision beyond a "basic" level are all consistent with plaintiff's own allegations. Plaintiff reported in her administrative paperwork that she gets along okay with authority figures, and her medical records show that she saw many different medical care providers and not one of them observed any problems with plaintiff getting along with anyone in their offices or hospitals. Although plaintiff reported stress at home and problems with her family, the evidence does not support a finding that she is restricted from working with or around people any more than that found by the ALJ.

I have thoroughly reviewed the entire record as well as plaintiff's arguments, and I find them to be without merit. The substantial evidence in the record as a whole supports the ALJ's residual functional capacity assessment.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

27

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 27, 2013

28